IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>JOSHUA ALEXANDER MUSGRAVES (01),<br><br>        Defendant. | Case No. 17-40029-01-DDC |

**MEMORANDUM AND ORDER**

On April 6, 2017, federal law enforcement officials arrested defendant Joshua Musgraves outside the Stormont Vail Hospital in Topeka, Kansas on suspicion that he had committed several robberies in the area. Just before he left the hospital and was arrested, Mr. Musgraves gave his wireless phone to Pami Hubbard's child so he could play with it. Ms. Hubbard and Mr. Musgraves have a young daughter together, but she was not the child allowed to play with Mr. Musgraves's phone. After federal officials arrested Mr. Musgraves, someone placed the phone inside a bag containing the belongings of Mr. Musgraves and Ms. Hubbard's daughter and took the bag to Carrie Holt's home. Ms. Holt is Mr. Musgraves's grandmother.

The current dispute arose when law enforcement officials removed Mr. Musgraves's phone from the child's bag and searched it. On October 23, 2017, Mr. Musgraves filed a Motion to Supress any evidence found on his phone (Doc. 29). Mr. Musgraves also filed a Motion to Sever Counts on October 24, 2017 (Doc. 30). The court held an evidentiary hearing on November 17, 2017. The court has considered the parties' briefs and evidence, and now is prepared to rule on both motions.

I.      **Factual Background**[1]

On April 6, 2017, federal law enforcement officials arrested Mr. Musgraves on a series of robberies in Lawrence and Topeka, Kansas. Just before they arrested him, Mr. Musgraves gave his phone to Pami Hubbard's young son.[2] At some point after his arrest, an unidentified person placed the phone in a pink bag and took the bag—with the phone still inside it—to the home of Mr. Musgraves's grandmother, Carrie Holt. In addition to the phone, this bag contained things used by Mr. Musgraves and Ms. Hubbard's young daughter.

Hours after Mr. Musgraves's arrest, FBI Task Force Officer Patrick Salmon interviewed Ms. Hubbard. He asked her about Mr. Musgraves's phone. She advised him that Mr. Musgraves's phone was in their daughter's bag and the bag was at his grandmother's house. When Officer Salmon asked to search the bag for the phone, Ms. Hubbard did not object.[3] The officials then went to the house occupied by the grandmother. Once they arrived there, law enforcement explained why they were there and asked for her consent to search the house for the bag. Ms. Holt signed a form explicitly consenting to a search of her house.[4] Ex. 2.

Mr. Musgraves had lived at his grandmother's house until three months before the search on April 6. And when the search was conducted, Mr. Musgraves still visited and, on occasion, slept in his grandmother's home. In fact, during their search of the grandmother's home, law

---

[1]     The following facts are taken from the uncontroverted facts of the Motion to Suppress (Doc. 29), the Government's Response in Opposition to the Motion to Suppress (Doc. 33), the exhibits that the government entered into evidence during the hearing, and Officer Salmon and Detective Ladd's testimony during the motion hearing, to the extent credible.

[2]     Ms. Hubbard and Mr. Musgraves are the parents of one daughter. The son who played with the phone is not Mr. Musgraves's son.

[3]     The evidentiary record does not contain proof that Ms. Hubbard consented explicitly to the search. But defendant's motion does not challenge the proposition that Ms. Hubbard consented to the bag's search.

[4]     This written consent does not address explicitly whether the grandmother also consented to a search of the child's bag, should the officers locate it. But the evidentiary record also contains credible evidence that the grandmother "did not object" to officers searching the bag. In any event, defendant's motion does not contest the issue of whether the grandmother gave her consent to search the bag.

enforcement officers found some of Mr. Musgraves's clothes there. The officers also found the pink bag and inside it, Mr. Musgraves's phone.

Then Topeka Police Department Detective Matt McClimans requested a search warrant from Judge David B. Debenham of the District Court of Shawnee County, Kansas. In his application for the search warrant, Detective McClimans asserted that Mr. Musgraves had committed several robberies in the area. And, Detective McClimans opined:

> Through my training and experience[,] I know that individuals commonly use their cellular telephones to communicate with other individuals through various means to include but not limited to voice calls, text messages, video calls, video messages, emails, instant messages, picture messages, and voice mails. I also know through my training and experience that individuals engaged in criminal activities will use cellular telephones and other mobile devices to communicate with other individuals involved in these illegal activities. These individuals will use cellular telephones in both the planning and commission of their various criminal activities. They will also use cellular telephones to assist in the furtherance of their crimes after the fact to include evading arrest and/or punishment for the crimes they have committed. Often times individuals engaged in illegal activities will use the many capabilities of their cellular phones to document their crimes to include but not limited to photographs and/or videos of themselves or others committing said crimes.

Ex. 5 at 6. Judge Debenham granted the request and issued the search warrant. His warrant authorized a search of Mr. Musgraves's phone for:

> Text messages, phone logs, picture[s], videos, audio files, emails, instant messages, contact lists, any and all documents that mention, refer to, depict, or in any manner relate to any of the [robberies] or [Mr. Musgraves], any other form of documentation or electronic data indicating the owner and or controlling party of said property, any and all other files and electronic data.

Ex. 6 at 2.

The Topeka Police Department later searched the phone and produced a forensic digital image. This image permitted officers to prepare an extraction report, which the Topeka officers shared with federal law enforcement officials. This report contained, among other things, cell

3

tower data, GPS data, location data, search history, and internet browsing history (collectively known as "location and web history data").

On May 3, 2017, the Grand Jury returned a superseding indictment, charging Mr. Musgraves with 13 counts (Doc. 12). Counts 1 and 2 charge Mr. Musgraves with robbery of Plato's Closet on January 6, 2017. Counts 3 and 4 charge him with robbing a KFC on January 20, 2017. Counts 5 and 6 charge him with robbery of a Burger King on March 23, 2017. Count 7 charges him with robbing a McDonald's on March 30, 2017. Counts 8 and 9 charge him with robbery of a Subway on April 3, 2017. Counts 10 and 11 charge him with robbing a Wing Stop on April 4, 2017. And, Counts 12 and 13 accuse Mr. Musgraves of robbing the Denison State Bank on December 10, 2016.

## II.   Discussion

### A.   Motion to Suppress

#### 1.   Mr. Musgraves's Standing[5]

As a preliminary matter, the government argues that Mr. Musgraves has no standing to challenge the search of the bag or his grandmother's home. "[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search." *United States v. Poe*, 556 F.3d 1113, 1121 (10th Cir. 2009) (citing *United States v. Rubio-Rivera*, 917 F.2d 1271, 1274 (10th Cir. 1990)). To have standing to challenge a search, a defendant must demonstrate that he has a subjectively and objectively reasonable expectation of privacy. *Id.* (quoting *United States v. Rhiger*, 315 F.3d 1283, 1285 (10th Cir. 2003)).

---

[5] The government also argues that Mr. Musgraves had no objective or subjective expectation of privacy in the bag and the officers thus did not conduct a "search" under the Fourth Amendment. The court does not address this issue directly because courts analyze this issue exactly the same way they consider standing arguments. *See Poe*, 556 F.3d at 1121 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'") (quoting *United States v. Rhiger*, 315 F.3d 1283, 1285 (10th Cir. 2003) (further citations omitted)).

Mr. Musgraves argues that he has standing to challenge law enforcement's search of his grandmother's home because he had lived at his grandmother's home until a few months before the search. The government responds that Mr. Musgraves does not have standing to contest the search of this home because he did not maintain a stable residence there. "An individual does not have to be 'settled' at a location to have a reasonable expectation of privacy; a simple overnight guest has Fourth Amendment standing." *Id.* at 1122. In addition, social guests have an objectively reasonable expectation of privacy in the home of another. *Rhiger*, 315 F.3d at 1287 (holding that defendant had standing to challenge the search of his friend's home when he slept in the home a few times a week, he left receipts there, he regularly stayed in the home during the day, and he felt comfortable entering the home unannounced to take naps there); *see also Poe*, 556 F.3d at 1122 (holding that defendant had standing to challenge the search of another's home when he previously had lived in the home, had a key to it, and was allowed to stay there when the owner was not present).

Mr. Musgraves's situation is similar. While he no longer stayed at his grandmother's home when the search was conducted, he still visited there occasionally and he kept clothes there. And Ms. Hubbard took his belongings to the grandmother's home after federal officials arrested him. While his grandmother's home was not Mr. Musgraves's permanent residence, that is not a prerequisite to standing. *See, e.g.*, *Poe*, 556 F.3d at 1122.

Mr. Musgraves likewise has standing to contest the search of his daughter's bag. Ms. Hubbard described the bag as a place where Mr. Musgraves kept his daughter's belongings and needs for the day. It is reasonable for a person to believe that others will not search his infant daughter's bag. *See United States v. Montano*, No. B-11-482, 2011 WL 13157358, at *2 (S.D. Tex. Sept. 14, 2011) (allowing defendant to challenge a government search of his child's diaper

bag because defendant packed the bag and also placed a few of his belongings in the bag). Mr. Musgraves thus has standing to challenge both the search of his grandmother's home and the bag used for his daughter's belongings.[6]

### 2. Consent to Search

Mr. Musgraves argues that law enforcement officers illegally searched his child's bag. The government argues that Mr. Musgraves's grandmother and Ms. Hubbard had authority to consent to search the bag. "A search does not require a warrant or probable cause if it is conducted pursuant to consent." *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (first citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); then citing *United States v. Romero*, 749 F.3d 900, 905 (10th Cir. 2014)). "The government has the burden of proving the effectiveness of a third party's consent." *United States v. Salinas-Cano*, 959 F.2d 861, 863 (10th Cir. 1992). Mr. Musgraves solely argues that neither Ms. Hubbard nor his grandmother had the authority to consent to a search of the bag. Mr. Musgraves does not challenge whether Ms. Hubbard or his grandmother actually consented to search the bag.

"An officer executing a search can rely on a third party's consent if that party has actual or apparent authority" to consent to a search of the property. *United States v. Romero*, 749 F.3d 900, 905 (10th Cir. 2014). A third party has actual authority when she mutually uses the property by virtue of joint access to or control of the property. *Id.* A third party has apparent authority when a reasonable officer would believe the third party had actual authority to consent. *Id.* Here, the government argues, Mr. Musgraves's grandmother had actual authority to consent to a search of her house and the bag, and Ms. Hubbard had authority to consent to a search of the

---

[6] At the hearing, the parties disagreed about the proper way to describe the bag. Mr. Musgraves referred to it as a backpack. The government preferred "book bag." The court has not seen the actual bag, but it has reviewed photographs of it. *See* Ex. 3, 4. Because the court's analysis of the issues does not depend on the bag's classification, the court does not choose between the parties' competing luggage descriptions.

bag.  Mr. Musgraves argues that he alone owned the bag and thus neither Ms. Hubbard nor his grandmother possessed authority to confer consent to a search the bag.

The court first addresses whether Ms. Hubbard could consent to the bag's search.  When the owner of property permits another person to use the property, the owner assumes the risk that the non-owner might give law enforcement consent to search the property.  *United States v. Bass*, 661 F.3d 1299, 1305 (10th Cir. 2011) (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)); *see also United States v. Lee*, 972 F. Supp. 1330, 1352 (D. Kan. 1997) ("It belabors the obvious that a person in charge of an infant's care has common authority over the child's diaper bag.").

Here, it was reasonable for Ms. Hubbard to use the bag.  Ms. Hubbard described it as "[Mr. Musgraves's] daughter's book bag."  The "child" referenced by this testimony was Mr. Musgraves and Ms. Hubbard's daughter.  No evidence suggests that Mr. Musgraves used the bag for his needs; instead, the child's caretakers—including Ms. Hubbard—used the bag for the child's needs.  Given this as the bag's purpose, Mr. Musgraves assumed the risk that others, including Ms. Hubbard, would give law enforcement consent to search the bag because a number of people accessed that bag to care for the child.  *Bass*, 661 F.3d at 1305.  Ms. Hubbard thus had actual authority to consent to a search of the bag.  *See Lee*, 972 F. Supp. at 1352.

Even if Ms. Hubbard lacked authority consent to a search of the bag, Mr. Musgraves's grandmother, in some circumstances, could consent effectively to the bag's search.  To be sure, a homeowner does not always possess the authority to consent to a search of every container found there.

> "A privacy interest in a home itself need not be coextensive with a privacy interest in the contents . . . of everything situated inside the home.  *A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home.  When a guest in a private home has a*

7

> *private container to which the homeowner has no right of access*[,] the homeowner lacks the power to give effective consent to the search of the closed container."

*Salinas-Cano*, 959 F.2d at 863 (quoting *United States v. Karo*, 468 U.S. 705, 725–26 (1984) (O'Connor, J., concurring) (alterations omitted)) (emphasis in original).

Instead, the question of whether a homeowner has authority to consent to a search of a container found in her home requires a more particularized analysis, turning on several factors. *Id.* at 864. First, the cases consider whether the container is historically associated with a high degree of privacy. *Id.* Courts associate containers such as suitcases, footlockers, and lock boxes with a high degree of privacy. *Id.* Courts do not associate containers such as regular cardboard boxes and plastic buckets as ones deserving a high degree of privacy. *Id.* The second factor considers whether the defendant took steps to maintain his privacy in the putative container, like locking the container or forbidding the homeowner from opening it. *Id.* A third factor considers whether the consenter ever indicated that the container belonged exclusively to the defendant. *Id.* (citing *White v. United* States, 444 F.2d 724, 726 (10th Cir. 1971).

The Circuit's opinion in *Salinas-Cano* illustrates how courts apply these factors. There, the defendant's suitcase was located in his girlfriend's apartment. *Id.* at 862. Law enforcement asked the girlfriend's permission to search her apartment, specifically for defendant's belongings. *Id.* She consented and showed the officers to the defendant's suitcase. *Id.* The officers found cocaine in the suitcase. *Id.* Although defendant never locked the suitcase, he never authorized his girlfriend to look inside the suitcase. *Id.* at 865. The Tenth Circuit held that the girlfriend's consent to search the suitcase was invalid. *Id.* It reasoned that society has long associated suitcases with a high expectation of privacy. *Id.* And the girlfriend informed the officers that defendant alone controlled the suitcase and never had allowed her to look in the suitcase. *Id.* These facts outweighed the fact that defendant had left the suitcase unlocked and

led the Circuit to conclude that defendant's girlfriend lacked authority to give effective consent for a search. *Id.*

Applying these same factors here, the court finds that Mr. Musgraves's grandmother could consent to a search of the child's bag. While society may associate some bags containing personal belongings with a high expectation of privacy, a bag used by a number of people charged with caring for a young child is different. The bag's owners reasonably would expect for other parents and caretakers to access the bag to retrieve things the child might need. And Ms. Hubbard told Officer Salmon that the bag was one for Mr. Musgraves's *child*—and not one used exclusively by Mr. Musgraves. The evidence here logically produces the inference that Mr. Musgraves's grandmother was one of the child's caretakers. That inference produces the conclusion that the grandmother had authority to give effective consent for a search of the bag.

Even if Mr. Musgraves's grandmother lacked actual authority to consent to open the bag, a reasonable officer could conclude that she—as one of the child's caretakers—had authority to access the bag. *See Lee*, 972 F. Supp. at 1352 ("It belabors the obvious that a person in charge of an infant's care has common authority over the child's diaper bag."). The evidence shows that the bag contained a boot belonging to the child, so this item supports an inference that the bag—perhaps among other things—was intended for the child's belongings. Ex. 4. Ms. Hubbard had left the child with Mr. Musgraves's grandmother. The grandmother was a caretaker—or, at minimum, one of her caretakers. The court thus finds that the grandmother had actual, or at the very least, apparent authority to consent to searching the bag.

### 3. Probable Cause for the Warrant

Mr. Musgraves next argues that law enforcement impermissibly searched his phone because the magistrate who issued the search warrant lacked probable cause to issue it. A

9

neutral magistrate can issue a search warrant if he reasonably believes the government has shown probable cause that the search will reveal evidence of criminal activity.  *United States v. Soderstrand*, 412 F.3d 1146, 1152 (10th Cir. 2005).  When reviewing a neutral magistrate's determination of probable cause, the reviewing court gives great deference to the magistrate's decision and asks only "'whether the issuing magistrate had a "substantial basis" for determining probable cause existed.'"  *Id.* (quoting *United States v. Le*, 173 F.3d 1258, 1265 (10th Cir. 1999) (further citations omitted)).

      Mr. Musgraves asserts that the warrant authorizing his phone's search lacked a nexus with the criminal activity suspected.  When assessing a magistrate's determination of probable cause, the reviewing court must find a "nexus between the suspected criminal activity and the place to be searched."  *United States v. Cooks*, 222 F. Supp. 3d 965, 970 (D. Kan. 2016).  "A sufficient nexus exists where an affidavit 'describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought are at a particular place.'"  *United States v. Knox*, 79 F. Supp. 3d 1219, 1228 (D. Kan. 2015) (quoting *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005)).

      This element does not require "'hard evidence or personal knowledge of illegal activity . . . .'"  *Id.* (quoting *Gonzales*, 399 F.3d at 1228).  But when an affidavit submitted to support a search warrant request presents no hard evidence, it must contain either the opinion of a law enforcement officer that he will find evidence of the crime in the place that he will search or sufficient facts to permit the magistrate to infer reasonably that the officer will find evidence of the crime in the place to be searched.  *Id.*; *see also United States v. Wiseman*, 158 F. Supp. 2d 1242, 1249 (D. Kan. 2001) (holding affidavit established probable cause to search suspect's cellphone when suspect was arrested for allegedly making methamphetamine and affiant gave

10

his opinion that people who make methamphetamine commonly use their cell phones to facilitate their crimes).

Here, the affidavit submitted to support the search warrant request contained no hard evidence or personal knowledge that Mr. Musgraves's phone contained evidence of illegal activity. Instead, Detective McClimans's affidavit states:

> Through my training and experience[,] I know that individuals commonly use their cellular telephones to communicate with other individuals through various means to include but not limited to voice calls, text messages, video calls, video messages, emails, instant messages, picture messages, and voice mails. I also know through my training and experience that individuals engaged in criminal activities will use cellular telephones and other mobile devices to communicate with other individuals involved in these illegal activities. These individuals will use cellular telephones in both the planning and commission of their various criminal activities. They will also use cellular telephones to assist in the furtherance of their crimes after the fact to include evading arrest and/or punishment for the crimes they have committed. Often times individuals engaged in illegal activities will use the many capabilities of their cellular phones to document their crimes to include but not limited to photographs and/or videos of themselves or others committing said crimes.

Ex. 5 at 6. Also, the affidavit recites some direct evidence that Mr. Musgraves had committed a series of robberies and had used the cell phone that the officers proposed to search.[7]

Here, Detective McClimans provided his opinion, formed after 19 years of experience as a law enforcement officer, asserting his belief that Mr. Musgraves's phone contained evidence linking him to the robberies. Specifically, Detective McClimans believed that evidence on the phone would help identify Mr. Musgraves as the alleged robber. The Fourth Amendment allows a law enforcement officer to rely on his experience to opine about the requisite nexus. *See Wiseman*, 158 F. Supp. 2d at 1249.

Mr. Musgraves argues a holding that this affidavit contains probable cause would undermine the Supreme Court's rationale in *Riley v. California*, 134 S. Ct. 2473 (2014). *Riley*

---

[7] Mr. Musgraves does not contest that the affidavit establishes probable cause that he committed the robberies.

held that law enforcement officers cannot search a phone incident to arrest; instead, they must apply for a search warrant. *Id.* at 2493. According to Mr. Musgraves's argument, to allow law enforcement officers to secure a warrant based solely on an officer's opinion that a phone is connected with a crime is tantamount to allowing search of a phone incident to arrest. Under Mr. Musgraves's reasoning, law enforcement could search every phone of every criminal suspect by simply opining that the criminal suspect may have used the phone to commit the suspected crime. This, he says, is a view rejected by *Riley*.

But *Riley* did not concern itself with this danger. Instead, it addressed situations where law enforcement officers search phones without bothering to seek a warrant from a neutral magistrate. *Id. Riley* emphasized, "[T]he warrant requirement is 'an important working part of our machinery of government,' not merely 'an inconvenience to be somehow "weighed" against the claims of police efficiency.'" *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 481 (1971)). While *Riley* discussed how "the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity," the Court explained that the Constitution's protection against these dangers was a warrant issued by a neutral magistrate. *Id.* at 2494. Thus, the fear advanced by Mr. Musgraves's argument is not a persuasive one.

The government also argues that even if the magistrate lacked probable cause to issue the search warrant, the officers executing the search reasonably relied on the warrant. A court will not suppress evidence located by an officer who relied in good faith on a warrant issued by a neutral magistrate. *United States v. Leon*, 468 U.S. 897, 920–21 (1984).

But *Leon*'s good faith principle is not limitless.  Specifically, an officer cannot invoke the good faith exception in four circumstances.  First, an officer cannot have good faith when the affidavit misleads the magistrate by providing information that the affiant knew was false, or would have known was false except for his reckless disregard of the truth.  *Id.* at 923.  Next, an officer cannot rely on a warrant in good faith when the "magistrate wholly abandon[s] his judicial role . . . ."  *Id.*  Third, an officer cannot rely "on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"  *Id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)).  Last, an officer cannot rely on a warrant that is "so facially deficient."  *Id.*

Here, none of these exceptions applies.  There is no evidence that any of Detective McClimans's statements in the affidavit were false.  Likewise, there is no evidence that Judge Debenham abandoned his judicial role.  Detective McClimans had a reasonable belief that the warrant was based on probable cause because courts regularly conclude that a law enforcement officer's opinion that a phone contains evidence of a crime—coupled with probable cause that the phone's owner committed a crime—is sufficient to grant a warrant.  *See, e.g.*, *Wiseman*, 158 F. Supp. 2d at 1249.  And, there is no evidence that the warrant here was "so facially deficient."  In sum, the court concludes that the search warrant was procured validly.  And even if it was not, Detective McClimans relied on the warrant's apparent validity in good faith.

### 4. Overbreadth of the Search and the Warrant

Mr. Musgraves asserts that the officers' search of the phone's location and web history data exceeded the scope of the warrant.  In the alternative, Mr. Musgraves argues that the warrant was overbroad.

Turning to Mr. Musgraves's first argument, officers may not search (or seize) things outside the scope of the search (or seizure) authorized by the warrant. *Patel v. Hall*, 849 F.3d 970, 984 (10th Cir. 2017). Here, the warrant authorized officers to search and seize the following things from Mr. Musgraves's cell phone:

> Text messages, phone logs, picture[s], videos, audio files, emails, instant messages, contact lists, any and all documents that mention, refer to, depict, or in any manner relate to any of the [robberies] or [Mr. Musgraves], any other form of documentation or electronic data indicating the owner and or controlling party of said property, any and all other files and electronic data.

Ex. 6 at 2. Mr. Musgraves argues that the officers easily could have included location and web history data in their application for the search warrant. But they did not. Thus, Mr. Musgraves contends, the search and seizure of that data from his phone was an unwarranted intrusion into his private information. The government responds, arguing that the location and web history data constitute documentation and electronic data identifying the cell phone's owner. And it also argues the location and web history data are documents that relate to the robberies. To simplify the discussion, the court truncates its analysis into two parts.

First, the court considers Mr. Musgraves's challenge to the locational data extracted from his phone. The warrant explicitly authorized a search for all "documentation or electronic data indicating" the person who owned or controlled the phone. Information showing where a phone was located tends to identify who owned the phone or, at minimum, who had control of the phone at a given moment. Locational data, the court holds, easily comes within the scope of the warrant.

This leads to the second target of defendant's challenge—the phone's data about web browsing history. Placing these data within the scope of the warrant is a dicier proposition. The government argues that the phone's web history could indicate who owned or controlled the phone at a given moment. This argument has some appeal. After all, web history showing that

14

someone used the phone to check ESPN's app for the scores of a Kansas City Royals or Chicago Cubs game combined with other evidence—*i.e.*, evidence showing that a suspect was an avid fan of one or both teams—would support an inference that a particular suspect controlled the phone at that moment.

Judicial review of search warrants "must be guided by practical realities . . . ." *United States v. Burgess*, 576 F.3d 1078, 1095 (10th Cir. 2009); *accord United States v. Henson*, No. 16-10018-01-JTM, 2017 WL 2687983, at *4 (D. Kan. June 22, 2017) ("Warrants are to be governed by practical, rather than technical considerations."). Using this practical approach, one reasonably can interpret the scope of the warrant's authority to include its web history.

Other aspects of the government's position are not as appealing. The United States argues the warrant authorized officers to search for all documents that "in any matter relate to any of the [robberies] or [Mr. Musgraves] . . . ." *See* Doc. 33 at 20. For more than two decades, our court has written about the vagaries of discovery in civil cases requests that pivot on the hinge of omnibus terms like "relating to." Magistrate Judge Gerald L. Rushfelt expressed these concerns about omnibus terms this way:

> Requests which are worded too broadly or are all too inclusive of a general topic function like a giant broom, sweeping everything in their path, useful or not. They require the [discovery's] respondent either to guess or move through mental gymnastics which are unreasonably time consuming and burdensome to determine which of the many pieces of paper may conceivably contain some detail, either obvious or hidden, within the scope of the request.

*Audiotext Comm'ns v. U.S. Telecom, Inc.*, No. 94-2395-GTV, 1995 WL 18759, at *1 (D. Kan. Jan. 17, 1995).

When used by discovery requests in civil cases, the questions inherent in omnibus terms impose unfair burdens on responding parties. But when search warrants employ them, they implicate more pernicious concerns. They invite after-the-fact "mental gymnastics" designed to

15

justify the scope of a search based solely on the content of the information that the search located. Who rationally can evaluate whether a particular text message "in any manner relate[s] to any" of the crimes being investigated? Or to the suspect? Omnibus terms like "relating to," long deemed too broad even for the forgiving scope of civil discovery, are even less appropriate for use as a component of a valid search warrant.

Had the government tried to justify its search of this phone's web history solely on the logic that this history "related to" one of the robberies, its arguments would not fare so well. *See United States v. Russian*, 848 F.3d 1239, 1245 (10th Cir. 2017) ("We have invalidated warrants authorizing computer searches 'where we could discern no limiting principle . . . .'" (quoting *United States v. Christie*, 717 F.3d 1156, 1164–65 (10th Cir. 2013))). But here, the government does not rely solely on that argument. As discussed, the court finds a sufficient nexus exists between the phone's web history and the warrant's authority to secure data showing who owned or controlled it. The court thus overrules defendant's objection to the government's search of web history on that basis.

This leads the analysis to Mr. Musgraves's next argument. It contends that any finding that the location and web history data are within the scope of the warrant renders the warrant overbroad. This, he asserts, amounts to a violation of the particularity requirement. *See id.* (holding a search warrant failed the particularity requirement when it authorized "a search of [defendant's] residence and seizure of any cell phones found inside" because the warrant did not describe where the officers could search and what they could seize with particularity).

A court must suppress evidence—assuming an exception to the exclusionary rule does not apply—that officers find after executing an overbroad search warrant. *Id.* Overbroad warrants give officers too much discretion over what they can and cannot search and seize. *Mink*

*v. Knox*, 613 F.3d 995, 1010 (10th Cir. 2010). In the context of electronic searches, "'warrants may pass the particularity test if they limit their scope either to evidence of specific federal crimes or to specific types of material.'" *Russian*, 848 F.3d at 1245 (quoting *United States v. Christie*, 717 F.3d 1156, 1165 (10th Cir. 2013) (further citations and quotations omitted)).

The court assumes, without deciding, that the warrant was overbroad. But the good faith doctrine prevents the court from excluding evidence found in the phone. As explained above, the good faith doctrine prevents a court from excluding evidence found after law enforcement have executed a search warrant in good faith. *Leon*, 468 U.S. at 920–21. And for the same reasons as above, no exception to the good faith doctrine is triggered. Defendant argues that the court should refuse to apply the good faith doctrine because a reasonable officer would know that the warrant was overbroad. But a reasonable officer could conclude that this warrant was not overbroad. *See Russian*, 848 F.3d at 1245 ("'[W]arrants may pass the particularity test if they limit their scope either to evidence of specific federal crimes or to specific types of material.'" (quoting *Untied States v. Christie*, 717 F.3d 1156, 1165 (10th Cir. 2013) (further citation and quotations omitted))). While the omnibus term "related to" creates concerns about the warrant's validity, a reasonable officer could conclude that the warrant's limit to information about the crime rendered the warrant valid. The court thus does not exclude the evidence extracted from Mr. Musgraves's phone.

### B.   Motion to Sever Counts

Mr. Musgraves's second motion argues that the court should sever the charges in the indictment and hold separate trials for each robbery and related count. The criminal rules permit this outcome. "If the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts . . . ." Fed. R. Crim.

P. 14.  To warrant severance, a defendant must show that joining the charges actually would prejudice his defense and that the resulting prejudice outweighs the expense and inconvenience of separate trials.  *United States v. Hutchinson*, 573 F.3d 1011, 1025 (10th Cir. 2009).

Factors to consider when weighing these considerations include whether the evidence overlaps in a way that will confuse the jury, whether the defendant will testify on his own behalf on one charge but not another, and whether the case for each charge is strong enough on its own. *United States v. Muniz*, 1 F.3d 1018, 1023 (10th Cir. 1993).  In addition, joinder of offenses that are similar in character produces more prejudice to defendant.  *Id.*  But when the government plans to present evidence common to multiple counts and this evidence will not confuse the jury, the court should allow the government to try those counts together to serve judicial economy. *See United States v. Adams*, 418 F. App'x 688, 692 (10th Cir. 2011) (holding that a district court did not abuse its discretion by refusing to sever counts that involved the same evidence and witnesses because "two separate trials [are] time-consuming, inconvenient, and [an] inefficient use of judicial resources").

After weighing these factors here, the court decides to sever the charges in Counts 12 and 13—the counts charging Mr. Musgraves with bank robbery—for a separate trial.  The government reports that the other robberies share common evidence.  For instance, the government plans to introduce a pair of red sneakers it says it found in Mr. Musgraves's car that it alleges he allegedly wore during the Subway and Wing Stop robberies.  In addition, law enforcement officers claim they found a variety of clothing in Mr. Musgraves's car that, the government claims, connects Mr. Musgraves to the McDonald's and Burger King robberies.  The government also claims a gun it recovered connects Mr. Musgraves to the KFC and Plato's Closet robberies.  And several witnesses reportedly will testify that Mr. Musgraves is connected

to more than one of the charged robberies.  The government also expects these witnesses to testify about each other.

Except for one witness, these common evidentiary showings do not connect Mr. Musgraves with the bank robbery charges.  And, to its credit, the government concedes that the bank robbery sticks out from the others.  Also, the court worries that the severity of the bank robbery charges could prejudice a jury to convict the defendant for the other robberies that charge Mr. Musgraves with robbing fast food or retail stores.

Mr. Musgraves argues that the court should sever the indictments because there is a large risk the evidence from the separate charges will confuse the jury.  Mr. Musgraves points to three witnesses in particular.  *Cf. United States v. Muniz*, 1 F.3d 1018, 1023 (10th Cir. 1993) (holding that a defendant was not prejudiced when the court joined counts that involved different witnesses).  One will testify about all seven robberies; another will testify only about her knowledge of the December 2016 and January 2017 robberies; and a third will testify about four of the robberies.  Mr. Musgraves worries that these witnesses will confuse the jury because they are not testifying to the same robberies.

But robberies that are committed at distinctly different times and places do not confuse a jury necessarily.  *United States v. Dixon*, 546 F. Supp. 2d 1198, 1206 (D. Kan. 2008) (refusing to sever charges based on five robberies, in part, because each robbery occurred at a distinct and separate time and place).  Here, the government has charged Mr. Musgraves with counts related to seven separate robberies.  Each robbery took place at a distinct time and place.  While Mr. Musgraves worries that the sheer number of robberies charged will prejudice the jury into believing that Mr. Musgraves is predisposed to be a criminal, the court will instruct the jury that it must consider each offense independently.  *See United States v. Thomas*, 849 F.3d 906, 912

(10th Cir. 2017) (holding that a district court did not abuse its discretion by refusing to sever robbery counts because the court instructed the jury to consider each charged robbery separately).

The court severs the two charges based on the bank robbery—Counts 12 and 13. But it denies the remainder of Mr. Musgraves's motion.

### III.   Conclusion

For the reasons explained above, the court denies Mr. Musgraves's Motion to Suppress but grants his Motion to Sever Counts 12 and 13 for a separate trial.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Musgraves's Motion to Suppress (Doc. 29) is denied.

**IT IS FURTHER ORDERED THAT** Mr. Musgraves's Motion to Sever Counts (Doc. 30) is denied in part but granted as it pertains to Counts 12 and 13. The court will try Counts 12 and 13 in a separate trial.

**IT IS SO ORDERED.**

**Dated this 19th day of December, 2017, at Topeka, Kansas.**

                                                                **s/ Daniel D. Crabtree**
                                                                **Daniel D. Crabtree**
                                                                **United States District Judge**